[No. 27616-3-III.    Division Three.    February 23, 2010.]

*In the Matter of the Marriage of* HUSNA OBAIDI,
*Respondent,* and KHALID QAYOUM, *Appellant.*

610

*Timothy H. Esser* and *Roger J. Sandberg* (of *Esser & Sandberg PLLC*), for appellant.

*Eric J. Engel* and *Andre L. Lang* (of *Engel Law Group PS*), for respondent.

¶1 KULIK, C.J. — A "mahr" is a prenuptial agreement based on Islamic law that provides an immediate and long-term dowry to the wife. Husna Obaidi and Khalid Qayoum, both children of Afghan immigrants, signed a mahr agreement written in Farsi during an engagement ceremony known as a Nikkah ceremony. Mr. Qayoum, who does not speak, read, or write Farsi, did not know about the mahr until 15 minutes before he signed it. An uncle explained the mahr to Mr. Qayoum after he had signed it. After a 13-month marriage, Ms. Obaidi filed a petition for dissolution of the marriage. Ms. Obaidi asserts that the mahr requires Mr. Qayoum to pay her $20,000 upon divorce.

¶2 The question presented here is whether the mahr is a valid agreement. We conclude that under neutral principles of contract law, the parties did not enter into an agreement for payment of $20,000 to the wife upon divorce. Therefore, we reverse the trial court's enforcement of the mahr. We affirm the trial court's award of attorney fees.

## FACTS

¶3 Ms. Obaidi and Mr. Qayoum were married for approximately 13 months. At the time of the marriage, Ms. Obaidi was 19 and Mr. Qayoum was 26. Mr. Qayoum is a United States citizen and has lived in the United States since he was 3. Ms. Obaidi is from Canada.

¶4 The parties are both children of Afghan immigrants, and the couple was married according to Afghan custom. As part of these customs, the parties signed a "mahr" agree-

ment during an engagement or Nikkah ceremony held on December 29, 2005. The Nikkah ceremony is a religious ceremony that is similar to a wedding reception at a typical Christian wedding. At some point during the Nikkah ceremony, Ms. Obaidi and Mr. Qayoum, along with a small group of family and friends, went into a smaller room. Verses from the Koran were read, and Ms. Obaidi and Mr. Qayoum each swore to take the other as his or her spouse. As part of the ceremony, the parties signed the mahr.

¶5 A mahr is an agreement based on Islamic law under which a husband agrees to pay a dowry to his wife. Generally, there is a short-term portion and a long-term portion. The short-term portion is due immediately. The long-term portion is the amount that the wife is entitled to take with her in the event of a divorce. In the mahr at issue here, the short-term portion was $100 and the long-term portion was $20,000.

¶6 The Nikkah ceremony was conducted in Farsi, except when Mr. Aji-sab, who performed the ceremony, asked Mr. Qayoum if he wanted to marry Ms. Obaidi. Mr. Qayoum does not speak, read, or write Farsi. Mr. Qayoum has lived in the United States for all but two or three years of his life. He considers himself "American first." Report of Proceedings (RP) at 107. He explained that he went through the Afghan marriage process because his mother was concerned that he would lose even the small amount of cultural knowledge he had about Afghanistan.

¶7 Mr. Qayoum testified that he had never heard the word "mahr" before the day of the Nikkah ceremony. He acknowledged that he had previously attended a couple of receptions, but he stated that he was unfamiliar with the Nikkah ceremony. According to Mr. Qayoum, he was not informed of the Nikkah ceremony until 10 or 15 minutes before the event took place. At some point, Mr. Qayoum selected an uncle to act as his representative during the discussions that took place as part of the Nikkah ceremony. The mahr, in total, states:

Marriage Certificate (Nekah Certificate)

Marriage Ceremony between Mr. Khalid Qayoum and Ms. Husna (the daughter of Mr. Habebullah Khan Obaidi) on December 29, 2005 took place in the presence of:

Witnesses:

   1- Mr. Abdullah Khan {Signed}

   2- Mr. Mohammad Aref Khan {Signed}

The proxy for groom (Khalid) was Mr. Abdul Sabour Khan {Signed}

The proxy for bride (Husna) was Mr. Hafezullah Khan {Signed}

Experts:

Haji Hayatullah Khan, Lateefullah Khan, Hemayetullah Khan, Abdul Khalil Qayoum, Javid, and Ehsan Khan {Signatures}

Short term marriage portion: One hundred Canadian Dollars

Long term marriage portion: 20,000.00 Dollars

The organizer: Mohammad-Ullah Faizi

Signatures of each witnesses [sic], proxies and experts {Signed and dated 12-29-2005}

Clerk's Papers (CP) at 42.

¶8 In the Afghan culture, the couple is considered married upon the completion of the Nikkah ceremony and, after this ceremony, Ms. Obaidi and Mr. Qayoum began holding themselves out as husband and wife. They later had an Islamic marriage ceremony on July 21, 2006, and solemnized their marriage civilly in Whitman County on November 6, 2006.

¶9 The parties lived with Mr. Qayoum's mother, starting in August 2006. On May 8, 2007, Ms. Obaidi, at her husband's request, went to Afghanistan for three and one-half months. Shortly after her return, she was asked to leave her mother-in-law's house. On December 7, Ms. Obaidi filed a petition for dissolution of marriage in King County Superior Court. In February 2008, the case was moved to Whitman County.

¶10 After the dissolution trial, the court entered findings of fact and conclusions of law. The written findings of fact and conclusions of law incorporate the court's oral ruling. The trial court concluded that Ms. Obaidi was entitled to the $20,000 mahr. Ms. Obaidi was awarded $8,250 in attorney fees and costs. This appeal followed.

¶11 On appeal, Mr. Qayoum contends the mahr contravenes the Washington policy of no fault divorce, the mahr is not enforceable as a contract or as a prenuptial agreement, the court's award of attorney fees to Ms. Obaidi was improper, and Mr. Qayoum should have been awarded his attorney fees in connection with the motion to change venue.

## ANALYSIS

■ ¶12 A party challenging decisions made in a dissolution proceeding must show that the trial court abused its discretion. *In re Marriage of Booth*, 114 Wn.2d 772, 776, 791 P.2d 519 (1990). A court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds for untenable reasons. *In re Marriage of Tower*, 55 Wn. App. 697, 700, 780 P.2d 863 (1989).

■ ¶13 On appeal, a trial court's findings of fact will be upheld if supported by substantial evidence. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). "Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the declared premise." *In re Marriage of Hall*, 103 Wn.2d 236, 246, 692 P.2d 175 (1984).

■ ¶14 A New Jersey case, *Odatalla v. Odatalla*, 355 N.J. Super. 305, 309, 810 A.2d 93 (Ch. Div. 2002), provides a helpful framework for considering the application of state law to a mahr agreement. In *Odatalla*, the trial court ordered the specific performance of the mahr agreement. The husband appealed, arguing that review of the mahr by a state court was precluded under the doctrine of separation of church and state. The husband also argued that the agreement was not a valid contract under New Jersey law. *Id.*

¶15 The *Odatalla* court looked for guidance to *Jones v. Wolf*, 443 U.S. 595, 602-03, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979), which explained the "neutral principles of law" approach that allows agreements to be enforced based on neutral principles of law, not religious doctrine. In *Jones*, a dispute over the ownership of church property was taken to a civil court in Georgia. The Court set aside the separation of church and state issues by applying the neutral principles of law doctrine. Justice Blackmun explained, "We cannot agree, however, that the First Amendment requires the States to adopt a rule of compulsory deference to religious authority in resolving church property disputes, even when no issue of doctrinal controversy is involved." *Id.* at 605. In other words, the Court determined that the controversy over the ownership of the property could be decided on neutral principles of law, not upon religious beliefs or policies. *Id.*

¶16 Based on *Jones*, the *Odatalla* court determined that the mahr did not violate the separation of church and state doctrine if the court could apply neutral principles of law to the enforce the mahr. *Odatalla*, 355 N.J. Super. at 311. The court concluded that the mahr could be enforced by applying neutral principles of contract law. *Id.* at 312. Notably, the court found all the elements of a contract even though the husband argued that the mahr was too vague to apply because it did not state when the money would be due. *Id.* at 313. Because the court determined that the mahr was simply a contract between two consenting adults, the court concluded that the mahr was not against public policy. *Id.* at 314.

¶17 Here, we apply neutral principles of Washington law. However, the trial court found the wife was not abused, not unfaithful, and did not do anything to create a forfeiture of the mahr under Islamic law. The trial court also found that the husband was not unfaithful, but that he had

initiated the separation without good cause. Consequently, the court erred by considering Islamic law or fault.

¶18 Applying the neutral principles of contract law, we can resolve this case by using these neutral principles of law, not Islamic beliefs or policies. We apply Washington law to resolve the issues of the formation and validity of the agreement.

■ ¶19 Mr. Qayoum raises arguments under the law applying to prenuptial agreements and the law of contract. Prenuptial agreements are subject to the principles of contract law. *In re Marriage of DewBerry*, 115 Wn. App. 351, 364, 62 P.3d 525 (2003).

■ ¶20 Mr. Qayoum asserts the mahr agreement was invalid under contract law. We agree. For a valid contract to exist, there must be mutual assent, offer, acceptance, and consideration. 25 DAVID K. DEWOLF, KELLER W. ALLEN & DARLENE BARRIER CARUSO, WASHINGTON PRACTICE: CONTRACT LAW AND PRACTICE § 2:2, at 34 (2d ed. 2007). Here, there was no meeting of the minds on the essential terms of the agreement. There were only two terms in the written mahr:

Short term marriage portion: One hundred Canadian Dollars

Long term marriage portion: 20,000.00 Dollars

CP at 42. There was no term promising to pay and no term explaining why or when the $20,000 would be paid.

¶21 A valid contract requires a meeting of the minds on the essential terms. *McEachern v. Sherwood & Roberts, Inc.*, 36 Wn. App. 576, 579, 675 P.2d 1266 (1984). Mr. Qayoum was not told that he would be required to participate in a ceremony that would include the signing of a mahr until 15 minutes before he signed the mahr. Here, Mr. Qayoum was unaware of the terms of the agreement until they were explained to him by an uncle after the mahr had been signed.

¶22 The negotiations preceding the execution of the agreement were conducted in Farsi. Also, the document was written in Farsi, which Mr. Qayoum does not read, write, or

speak. Mr. Qayoum did not have the opportunity to consult with counsel, although he was advised by his uncle, who is neither an attorney nor an expert in Islamic law, *after* the agreement was signed. Because Mr. Qayoum could not speak, write, or read Farsi, there was no meeting of the minds as to the terms of the mahr agreement.

¶23 In addition, the court indicated that the agreement was influenced by duress. In its oral decision, incorporated by reference in the findings of fact, the court stated:

> [Y]ou had the opportunity to—if you didn't like the Mahr, if you didn't like what you signed—uh you could have cancelled it. Nobody was holding a gun or sword to your head. You could have decided not to go ahead and get married, uh but you were told, granted at the last minute, what it meant—hey you were going to owe her twenty grand for [the] Mahr—uh, and you went ahead and signed. That there was a lot of pressure from both families that you know you felt kind of psychologically backed into a corner and didn't really have a choice, psychologically coerced in your own mind with family pressures, certainly.

RP at 126-27.

¶24 The trial court's finding that the mahr was a valid contract was not supported by substantial evidence. Because we conclude no valid contract was formed, we need not reach the other assertions of error raised by Mr. Qayoum.

¶25 Under RCW 26.09.140, the court may award attorney fees after balancing the need of the requesting party against the ability to pay of the nonrequesting party. If a court grants attorney fees under RCW 26.09.140, the court must state on the record the method used to calculate the award. *In re Marriage of Knight*, 75 Wn. App. 721, 729, 880 P.2d 71 (1994). An award of attorney fees is reviewed for an abuse of discretion. *Chuong Van Pham v. Seattle City Light*, 159 Wn.2d 527, 538, 151 P.3d 976 (2007).

¶26 Mr. Qayoum does not question the *award* of attorney fees to Ms. Obaidi. Instead, he raises two arguments challenging the *amount* awarded to her.

¶27 The court awarded Ms. Obaidi $8,500 in attorney fees. In its oral decision, the court stated:

Now as to the issue of attorneys' fees—clearly the wife has a need; clearly the husband has an ability to pay. I hereby order that he pay her $8,500—flat fee—towards her costs and fees. She has the ability to pay some, she makes about $15,000 a year; he makes about a hundred grand a year. It doesn't take rocket scientists to figure out where I'm coming from on the proration there.

RP at 128.

¶28 Mr. Qayoum asserts that the court abused its discretion by failing to state on the record what method was used to calculate the amount of the attorney fees. The court suggests a method but does not give us all of the relevant figures. Here, the court prorated the attorney fees based on the parties' salaries. The missing figure is the amount of Ms. Obaidi's attorney fees. However, Ms. Obaidi testified that she had incurred around $8,000 in fees through the first day of trial. Although the trial court's method is not completely transparent, we cannot say that the court abused its discretion in setting attorney fees.

¶29 Based on Mr. Qayoum's motion for reconsideration, the court reduced Ms. Obaidi's award of $8,500 by the $250 Mr. Qayoum requested. Mr. Qayoum now seeks an award of fees under RCW 4.12.090, but he has waived this argument by failing to ask for an award of fees in his motion for reconsideration.

¶30 Ms. Obaidi asks for attorney fees based on her argument that this is a frivolous lawsuit. An appeal is frivolous if there are no debatable issues upon which reasonable minds could differ and it is so totally devoid of merit that there was no reasonable possibility for reversal. *Green River Cmty. Coll. Dist. No. 10 v. Higher Educ. Pers. Bd.*, 107 Wn.2d 427, 443, 730 P.2d 653 (1986) (quoting *Boyles v. Dep't of Retirement Sys.*, 105 Wn.2d 449, 509, 716 P.2d 869 (1986) (Utter, J., concurring in part, dissenting in part)). This appeal is not frivolous.

¶31 We hold that under neutral principles of contract law, Mr. Qayoum and Ms. Obaidi did not enter into a valid agreement for payment of $20,000 to Ms. Obaidi upon divorce. Thus, we reverse the trial court except as to the award to Ms. Obaidi of $8,250 in attorney fees.

BROWN and KORSMO, JJ., concur.

Reconsideration denied April 21, 2010.

Review denied at 169 Wn.2d 1024 (2010).